UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 07-3419(DSD/JJG)

Hijazi Medical Supplies, a
foreign corporation, and
Riyad M. Hijazi, an individual,

      Plaintiffs,

v.                                                              **ORDER**

AGA Medical Corporation, a
Minnesota corporation, and
Amplatzer Medical Sales
Corporation, a Minnesota
corporation,

      Defendants,

v.

Ziyad Hijazi,

      Counter-Defendant.

    Ronald K. Gardner, Jr., Esq., Patrick R. Burns, Esq. and Dady & Garner, 80 South Eighth Street, Suite 5100, Minneapolis, MN 55402 and Melanie P. Persellin, Esq. and Jensen, Anderson, Sondrall, P.A., 8525 Edinbrook Crossing, Suite 201, Brooklyn Park, MN 55443, counsel for plaintiffs.

    Thomas S. Fraser, Esq. and James R. Mayer, Esq. and Fredrikson & Byron, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402, counsel for defendants.

    Eric P. Sparks, Esq., Paul W. Carroll, Esq. and Gould & Ratner, 222 North LaSalle Street, Suite 800, Chicago IL 60601, counsel for counter-defendant.


    This matter is before the court on plaintiffs' and defendants' separate motions for partial summary judgment. After a review of the file, record and proceedings herein, and for the following

reasons, the court denies plaintiffs' motion and grants in part defendants' motion.

## BACKGROUND

This federal diversity action arises out of defendant AGA Medical Corporation's ("AGA") April 13, 2007, termination of plaintiff Hijazi Medical Supplies ("HMS") as a distributor of AGA products.  AGA is a Minnesota corporation that develops and manufactures medical devices for cardiovascular applications.[1] HMS is a Jordanian business that distributes medical devices. Plaintiff Riyad M. Hijazi ("Riyad") is HMS's president and a resident of Amman, Jordan.  Counter-defendant Ziyad Hijazi ("Ziyad") is Riyad's brother, a cardiologist and a former AGA consultant who resides in Illinois.  While HMS was a distributor for AGA, Ziyad and Riyad frequently communicated about HMS and Ziyad often acted as a conduit between the two companies to ensure proper communication of HMS's orders to AGA.  (Riyad Dep. at 73, 77; Ziyad Dep. at 16-17, 47.)

In 1996, AGA's then president and Chief Executive Officer, Frank Gougeon ("Gougeon"), informally appointed Riyad as AGA's representative in the Middle East.  (Riyad Aff. ¶ 3.)  On October 20, 2004, HMS and AGA entered a written Distributor Agreement

---

[1] Defendant Amplatzer Medical Sales Corporation is a wholly owned subsidiary of AGA.  The court refers only to AGA.

("Agreement") appointing HMS as the exclusive distributor of certain AGA products for five years in "Jordan, Bahrain, Iran, Iraq, Lebanon, Oman, Qatar, U.A.E., Egypt, Alyemen, Syria, Libya, Palestine, and Sudan." (Gardner Aff. Ex. 2.)  A November 23, 2005, Letter of Authorization ("Letter") further authorized HMS "to handle marketing, distribution, and post market service" of certain AGA products in the countries listed in the Agreement plus Algeria and Morocco for three years.[2]  (Id. Ex. 4.)

The Agreement, which was signed by Riyad and AGA's director of international sales and marketing, Mark Cibuzar ("Cibuzar"), incorporated certain general conditions that permitted termination for cause upon thirty days notice and an opportunity to cure.[3] (Id. Ex. 3.)  These conditions also permitted AGA to immediately terminate the distributorship if HMS breached paragraph four of the Agreement, wherein HMS "specifically acknowledge[d] that it [was]

---

[2] The Letter became effective when Riyad signed it on December 11, 2005.

[3] Paragraph I(1) of the general conditions provides that:

> Failure by either party to comply with any of its obligations hereunder shall entitle the other party to give to the party in default notice requiring it to make good such default.  If such default is not made good within thirty (30) days after such notice, the notifying party shall be entitled (without prejudice to any of its other rights conferred on it by this Agreement or by law) to terminate this Agreement by giving notice to take effect immediately.

(Gardner Aff. Ex. 3.)

aware of the [FCPA] and its applicability to this Agreement and specifically agree[d] to comply with all provisions and prohibitions contained therein in the conduct of all activities under this Agreement."  (Id. Ex. 2, 3.)

In June 2005, AGA suspended shipments to the People's Republic of China ("PRC") because of alleged violations of the Foreign Corrupt Practices Act ("FCPA") by its distributor Larry Meng ("Larry") of Beijing Since Medical Scientific, Ltd. ("BSMS").  On August 12, 2005, Larry e-mailed Ziyad asking him to have Riyad order AGA products and ship them to his "Hong Kong office."  (Mayer Decl. Ex. I.)  Larry listed the contact for his Hong Kong office as Biao Meng[4] ("Biao") of Since International Development, Ltd. ("SID").  (Id.)  Ziyad forwarded the request to Riyad, stating that "we need to help Larry.  Please order the items below and ship [them to the] Hong Kong address immediately."  (Id.)  In November 2005, Ziyad met Larry in the PRC to discuss BSMS's suspension and later attempted to mediate a resolution of the situation with AGA. (Ziyad Dep. at 30-39.)   AGA, however, terminated BSMS's distributorship on April 12, 2006.[5]  At Riyad's behest, Ziyad

---

[4] Biao is Larry's brother.  Riyad claims that he did not know of the relationship between Biao and Larry until after AGA terminated HMS.  (Riyad Dep. at 115.)

[5] Following a voluntary disclosure by AGA, the United States Department of Justice ("DOJ") investigated the alleged FCPA violations.  The investigation resulted in a settlement between AGA and the DOJ.  (Burns Aff. Ex. F at 5.)

4

thereafter unsuccessfully attempted to secure the PRC distributorship for HMS.  (Riyad Dep. at 74-75; Ziyad Dep. at 41, 48-58.)

On January 9, 2007, Riyad provided Cibuzar with HMS's 2006 sales report, which did not reveal shipments to Hong Kong.  (Mayer Decl. Ex. C; Riyad Dep. at 54.)  In an April 3, 2007, letter, Gougeon informed Riyad that certain AGA products shipped to HMS in 2005 and 2007 were later found in the inventory of a hospital in the PRC and that BSMS may have imported and sold those products.  (Mayer Decl. Ex. D.)  The letter requested an explanation by April 9, 2007.  (Id.)  On April 4, 2007, Riyad denied selling AGA products in the PRC and speculated that the products came from a company that HMS shipped products to in Iraq.  (Id. Ex. E.)  That same day, Ziyad asked Larry to tell AGA that the products found in the PRC came from Iraq, and in an April 5, 2007, e-mail, Ziyad informed Riyad that Larry had agreed.  (Id. Ex. G, H.)  On April 6, 2007, Riyad notified AGA's Chief Operating Officer, John Barr ("Barr"), that he had narrowed the origin of the products found in the PRC to two distributors and requested the products' serial numbers.[6]  (Gardner Aff. Ex. 6.)

On April 9, 2007, Riyad informed Barr that HMS had distributed AGA products to SID in Hong Kong and that the products found in the

---

[6] Riyad later testified that he suspected distributors in the United Arab Emirates and Iraq.  (Riyad Dep. at 174.)

PRC likely came from SID.[7]  (Mayer Decl. Ex. F.)  Barr responded on April 10, 2007, noting that SID is wholly owned by BSMS and ordered HMS to halt all shipments to Hong Kong.  (Gardner Aff. Ex. 8.) Barr further required Riyad to provide HMS's complete shipping records to SID by April 13, 2007.  (Id.)  On April 11, 2007, Riyad informed Barr that HMS stopped shipping products to SID in February 2007 but that he could not provide complete shipping records for 2005 and 2006.  (Id. Ex. 9.)  Gougeon sent Riyad a Notice of Termination ("Notice") on April 13, 2007, immediately terminating the Agreement and Letter.  (Id. Ex. 10.)  The Notice provided that HMS breached paragraphs one and four of the Agreement by knowingly shipping AGA products to Hong Kong for further redistribution within the PRC on at least sixteen occasions between August 2005 and February 2007 and concealing the shipments from AGA.  (Id.) The Notice further asserted that "HMS intentionally misled AGA representatives investigating HMS' conduct" and "breached [the Agreement] by failing to provide complete and accurate books and records of account relating to HMS' inventory and sales of AGA products."  (Id.)

At the time of HMS's termination, AGA had shipped $769,025.88 in products to HMS for which HMS had not paid.  (Second Mayer Decl.

---

[7] Riyad denies knowing that Hong Kong was part of the PRC at the time HMS shipped AGA products to SID.  (Riyad Dep. at 142.)

Ex. A.)  AGA invoiced HMS for those shipments and payment was due between April and June 2007.  (Id.)

Plaintiffs brought this action against AGA on July 20, 2007, alleging breach of contract, tortious interference with existing contracts, intentional interference with prospective contractual relations or business advantage and unjust enrichment.  AGA counterclaimed against HMS, Riyad and Ziyad, asserting claims for breach of contract, account stated, promissory estoppel, unjust enrichment, conversion and fraud.  AGA moved for partial summary judgment on July 8, 2008, seeking a damages limitation on plaintiffs' breach of contract claim and judgment on AGA's account stated counterclaim.  On August 19, 2008, plaintiffs moved for partial summary judgment as to AGA's liability on plaintiffs' breach of contract claim.

## DISCUSSION

**I.  Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material only when its

resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial.  See Celotex, 477 U.S. at 324.  Moreover, if a plaintiff cannot support each essential element of his claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Id. at 322-23.

**II. Breach of Contract**

    **A.   Liability**

Plaintiffs argue that AGA breached the Agreement by not providing notice and an opportunity to cure before terminating the distributorship.[8]  AGA contends that it had the right to immediately terminate the Agreement because plaintiffs conspired with Larry and BSMS to violate the FCPA.

---

[8] To the extent plaintiffs argue that AGA did not have cause to terminate the distributorship, (see Pl.'s Reply Br. [Doc. No. 70] at 14), the court determines an issue of fact remains.

8

The FCPA prohibits "brib[ing] foreign government officials to obtain or retain business, or to direct business to another person." United States v. Kozeny, 493 F. Supp. 2d 693, 703 (S.D.N.Y. 2007) (quotation omitted); see 15 U.S.C. § 78dd-1 et seq.; United States v. King, 351 F.3d 859, 863 (8th Cir. 2003). To violate the FCPA, an individual must have "a bad or wrongful purpose and an intent to influence a foreign official to misuse his official position." Kozeny, 493 F. Supp. 2d at 704 (quotation omitted). A conspiracy is an agreement between at least two people to violate the law. See United States v. Jenkins, 78 F.3d 1283, 1287 (8th Cir. 1996). The agreement need not be formal. United States v. Jackson, 345 F.3d 638, 648 (8th Cir. 2003) (citation omitted). Rather, "a tacit understanding is sufficient, and can be proved by direct or circumstantial evidence." Id. (citation omitted). "'Although not sufficient by itself, association or acquaintance among the [alleged conspirators] supports an inference of conspiracy.'" Id. (quoting United States v. Sparks, 949 F.2d 1023, 1027 (8th Cir. 1991)).

Taking all facts and inferences in favor of AGA, the record suggests that HMS, unbeknownst to AGA, shipped AGA products to SID between 2005 and 2007. Further, Ziyad's knowledge of the FCPA allegations against BSMS and his frequent communications with Riyad support an inference that Riyad knew of BSMS's suspension and the reason for that suspension in 2005. Indeed, Ziyad testified that

9

"everybody knew about [AGA's] investigation of [BSMS]. The distributors with AGA they all talk to each other." (Ziyad Dep. at 40-41.)  Moreover, the August 12, 2005, e-mail, Ziyad's April 4, 2007, communication with Larry and Ziyad's April 5, 2007, e-mail to Riyad, support Riyad's knowledge that SID and BSMS were related entities and that the products HMS shipped to SID would later be shipped to BSMS.  The record further indicates that Riyad concealed the Hong Kong shipments by submitting a false 2006 sales report, and when confronted by AGA about the products found in the PRC, Riyad initially obfuscated the likely origin of those products.  Taken as a whole, these facts support an inference that Riyad conspired with Larry to violate the FCPA.  Therefore, AGA may have had the right to immediately terminate the Agreement, and summary judgment as to AGA's liability is not warranted.[9]

   **B.   Damages Limitation**[10]

The Agreement contemplated a five-year term but permitted either party to terminate the distributorship without cause upon ninety days written notice after October 19, 2007.  (Gardner Aff.

---

[9] AGA also argues that Riyad violated paragraph four because he testified in his deposition that at the time he signed the Agreement he was unaware of the FCPA.  (See Riyad Dep. at 28-29.) The record, however, establishes that Riyad received FCPA training in February 2007 and any alleged deficiency in his awareness of the FCPA was cured before AGA terminated the Agreement.  Therefore, the court determines that this argument does not provide an alternative basis for AGA's immediate termination of the distributorship.

[10] In this section, the court takes all evidence and inferences in a light most favorable to plaintiffs.

Ex. 2 ¶ 3.)  Thus, AGA maintains that even if it terminated the Agreement without cause, plaintiffs may not recover damages beyond January 18, 2008.  Plaintiffs argue that because the without cause termination provision was not in effect at the time of AGA's alleged improper termination of the Agreement, AGA cannot rely on that provision to limit its potential liability.

"When a breaching party has the power to terminate a contract upon notice, the general rule is that the calculation of damages is limited to the notice period."  Children's Broad. Corp. v. Walt Disney Co., 245 F.3d 1008, 1019 n.4 (8th Cir. 2001) (citing Minnesota law).  This is so because "the measure of damages is based upon the expectancy value of the contract."  In re Petroleum Carriers Co., 121 F. Supp. 520, 527 (D. Minn. 1954).

In April 2007, AGA did not have the right to terminate the Agreement without cause upon notice.  Nevertheless, such a right would have vested on October 20, 2007.  Therefore, in light of AGA's April 2007 termination of the distributorship, the expectancy value of the contract is limited to the ninety day notice period after AGA's right to terminate without cause would have vested.  Accordingly, under the written Agreement plaintiffs may only recover damages until January 18, 2008.  Plaintiffs maintain, however, that the parties orally modified the Agreement to prohibit termination without notice and an opportunity to cure after October 19, 2007.

Where a written agreement is fully integrated,[11] the parol evidence rule prohibits a court's consideration of "'evidence concerning discussions prior to or contemporaneous with the execution of [the agreement] when that evidence contradicts or varies [its] terms.'" Michalski v. Bank of Am. Ariz., 66 F.3d 993, 996 (8th Cir. 1995) (quoting Gutierrez v. Red River Distrib., Inc., 523 N.W.2d 907, 908 (Minn. 1994)). A court may consider evidence of subsequent oral modifications to a written contract.[12] Sokol & Assocs., Inc. v. Techsonic Indus., Inc., 495 F.3d 605, 610 (8th Cir. 2007) (citing Larson, 400 N.W.2d at 781). However, "allegations of modifications inconsistent with the written terms of a contract are subject to 'rigorous examination.'" Id. at 610-11 (quoting Bolander v. Bolander, 703 N.W.2d 529, 541-42 (Minn. Ct. App. 2005)). In other words, such modifications must be shown by clear and convincing evidence. Bolander, 703 N.W.2d at 542 (citing Dwyer v. Ill. Oil Co., 252 N.W. 837 (Minn. 1934)).

The only evidence in this case supporting an oral modification of the Agreement is a declaration submitted by Riyad. In that

---

[11] The Agreement provides that it "contains the entire understanding of the parties with respect to the matters herein contained and voids all prior understandings, if any, between the parties with respect to the distribution of any Products manufactured or sold by AGA." (Gardner Aff. Ex. 3 ¶ Q.)

[12] The Agreement expressly requires modifications to be in writing. (Gardner Aff. Ex. 3 ¶ Q.) Minnesota law, however, permits oral modifications even if a contract requires written modifications. See Larson v. Hill's Heating & Refrig. of Bemidji, 400 N.W.2d 777, 781 (Minn. Ct. App. 1987).

declaration, Riyad indicates that throughout his relationship with AGA, Gougeon and Cibuzar advised him on several occasions that maintenance of HMS's distributorship was based on performance and that HMS would be given an opportunity to cure any alleged deficiencies before termination.  Moreover, Riyad notes his understanding that in exchange for the territorial expansion contemplated by the Letter, HMS could be terminated only after notice and an opportunity to cure.  The declaration, however, contains only vague assertions.  Riyad does not refer to specific communications with Gougeon and Cibuzar, nor does he distinguish between inadmissible pre-Agreement and admissible post-Agreement statements.  Further, the declaration does not indicate that Cibuzar, Gougeon or any other AGA employee stated that the Letter modified the termination provisions of the Agreement.  Rather, the declaration provides only that Riyad understood the Letter to have such an effect.  In light of these shortcomings, the court determines that Riyad's declaration would not permit a reasonable jury to find by clear and convincing evidence that the parties orally modified the Agreement's termination provisions.  Cf. Sokol & Assocs., Inc., 495 F.3d at 610-13 (finding oral statements, writings and conduct of parties insufficient to raise genuine fact issue as to modification); Diomed, Inc. v. Vascular Solutions, Inc., 417 F. Supp. 2d 137, (D. Mass. 2006) (relying on Minnesota law to find no fact issue as to modification).

13

Finally, plaintiffs argue that further discovery is necessary to produce evidence of the parties' oral modification of the Agreement's termination provisions. Specifically, plaintiffs request more time to receive AGA's responses to interrogatories, production of documents and requests for admission, as well as to depose AGA employees. A court may order a continuance to enable further discovery. See Fed. R. Civ. P. 56(f). In this case, however, Riyad would have been a party to any communications regarding modification of the Agreement and could have provided facts sufficient to withstand summary judgment. His failure to provide such facts does not warrant a continuance, and the court denies plaintiffs' request. Accordingly, the court determines that the Agreement limited damages to those incurred before January 18, 2008, and plaintiffs have not provided sufficient evidence to support a modification. Therefore, the court grants AGA's motion for partial summary judgment as to damages.

## III. Account Stated[13]

AGA argues that it is entitled to summary judgment on its account stated counterclaim. An account stated claim is an alternative to a breach of contract action by which a party may establish liability for a debt. See Am. Druggists Ins. v. Thompson Lumber Co., 349 N.W.2d 569, 573 (Minn. Ct. App. 1984) (citations

---

[13] In this section, the court takes all evidence and inferences in a light most favorable to plaintiffs.

omitted). An account stated arises "through an acknowledgment or an acquiescence in the existing condition of liability between the parties." Bureau of Credit Control, Inc. v. Luzaich, 163 N.W.2d 317, 319 (Minn. 1968) (quotation omitted). If a party acquiesces to an account rendered and admits the accuracy of the account, the law implies a promise to pay the amount "acknowledged to be owing and due, without further proof." Id. However, an account stated is not created when a party acknowledges the correctness of the account but expressly refuses to pay. 1A C.J.S. Account Stated § 19 (2005).

In this case, the parties stipulated "without prejudice to any claims or defenses" that AGA sold and shipped products to HMS for $769,025.88, HMS accepted the products, AGA invoiced HMS for the correct amount and HMS has not paid AGA. (See May 12, 2008, Stip. [Doc. No. 39].) Although plaintiffs acknowledged the accuracy of the invoices, the record indicates that they expressly refused payment and have not acted in a manner that establishes acquiescence to liability for $769,025.88. (See Riyad Dep. at 91-92.) Therefore, summary judgment on AGA's account stated claim is not warranted.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that:

1. AGA's motion for partial summary judgment [Doc. No. 46] is granted in part; and

2. Plaintiffs' motion for partial summary judgment [Doc. No. 58] is denied.

Dated:  November 10, 2008

                                             <u>s/David S. Doty</u>
                                             David S. Doty, Judge
                                             United States District Court